I guess I'll start all over. Good morning, Your Honors. My name is Emanuel Guyon, and I represent Robert Bobczak in this case. I submitted my briefs and reply brief, and I think there's a lot of technical things in there that I hope that I wouldn't have to refer to, but what I've said there, I stand by. But I want to distinguish the case that's presented to the court. Mr. Bobczak started out with a problem with glaucoma, and that was adequately addressed by the Illinois Eye Institute in Washington and Peoria, Illinois. They put a stent in that's described in the brief, and one in the right eye, which gave no trouble, but the left eye was a severe case of glaucoma, so they used the eye stent with the injector needle. We're saying that this is a case that's product's liability and the defense say that this is strictly the only reason for the existence of this case is to address the condition of glaucoma. We agree that glaucoma has been addressed at the level of intervention, and Mr. Bobczak does not have particular problems, although while you can address it at the level of intervention, I guess there's the gradual increases for which no one can control. Our problem with the implant was that the medical device was defectively designed, and they have admitted that it was contaminated with chemicals called glutaraldehyde and a polishing compound. This information was sent to the FDA in Washington, D.C. 21 CFR 7 says that it's a class 2 medical device, and because it's that, they don't have to tell what the problems are, but Mr. Manufacturer, if you've got them under control, then you just, you handle it, and thank you for telling us about it. Now when we started with the case, I tried to get discovery from the defense, and the trial court refused my discovery on the basis that it was in excess of 30 interrogatories, but I pointed out to the court more than once that the discovery rules were changed in 1996 to allow one interrogatory with subparts, and I modeled my interrogatories on the basis of the Tarantino, if I can refer to it as that, a product's liability case, asking, you know, subparts. I also referred to the examples given by the Supreme Court for medical malpractice, for hospital administrators, for auto cases, and family law. The defense said that those are the only four that can be, it can be used for. I think when you write a rule under the Code of Civil Procedure, it applies to any cases filed in the court system, and I think that this is a product's case, and there's others that I haven't mentioned, but I think that subparts is a legitimate tactic on the part of a plaintiff to get a lot of information about the case that is, makes the case understandable to the parties and to the court eventually and to a jury. So, but the trial court refused me four times on that, and they said that you get 30 interrogatories, and at the end of 30 interrogatories, no more. I think that was plain error on the part of the court, and I'm turning attention now to the medical device that was manufactured by Allergan, Allergen, and eventually AbbVie became the owner of the product because it acquired Allergan, and I mention that because we filed initially in district court in Chicago, and just so the court is informed, when AbbVie purchased Allergan, that destroyed diversity under 1332 of the federal rules, so the case was automatically dismissed in the federal system, but then refiled in the state system within one year. That is allowed. Now, the, I mentioned a moment ago about the 21 CFR 7, the AbbVie recall, Allergan actually recalled because of reports of problems, and they actually had to recall 145,000 plus units to the manufacturer because there was a defect in them. Now, was it the same defect that Mr. Bobchock experienced? I don't know because they didn't tell us. They haven't released that information. That's proprietary, and if they don't want to release it, I guess they don't have to, but if there's a voluntary report and no detail is required, that does not justify the trial court here denying me discovery, and I think that I did my best effort to try to obtain information about this, what happened here, but it was all determined that I could not get the discovery. We claim that the medical device has a manufacturing defect, a design defect, and a failure to warn. The glaucoma condition was addressed properly, and it's not an issue in the case. It was arrested at the level of intervention. The problem is continued injury caused by the design of the stent. In the instructions that Allergan sent out, they said that it's a porcine dermis, and porcine means pig, as you probably discovered or knew, and then it's a flexible, they call it the eye stent, but it's sort of like an eyelash, and it's medically cold sterilized by glutaraldehyde. Now, there's been no effort or there's no explanation if when they cold sterilized the eye stent that all of the crystals of the glutaraldehyde were removed. In talking in one of the depositions, the comment was made that the doctor looked at the stent and he said it looked okay to him, but your honors, I plan to show two pins that I use in my office. They're made by TUL, T-U-L, unanimous staples. It's a five millimeter is the fine point, and a seven millimeter is the normal point. This stent is a six millimeter, and they drill a hole in six micrometers in that stent to produce a canal that drains the ocular fluid and controls the glaucoma. So, we're talking about very, very tiny things. The problem is they have never assured us in the discovery that was refused how they that there's no glutaraldehyde crystals left in the, if that's what they use for the cold sterilization process, that they assured the user, Dr. Liguris in Peoria, and he looked at it and said, well, it looks okay to me, but these stents are shipped in Tyvek packages and protected by gamma radiation and so on. The instructions are if there's anything that looks unusual about the package, don't use it. Council, Mr. Guyatt, can I ask you with regard to the issues on the discovery, the protective order was written by Babchak, correct? No, it was written by the, it was not written by Mr. Babchak. It was the trial court entrant order that was prepared by Babchak and council, right? No, I don't, I never, I do not recall that. I said, if you tell me what the trade secrets are, then I'll know what you're asking me to give up. You're asking me to give up things about the case that I don't even know about. And it was 11 pages. And I said, no, I'm not signing that. So, by default, the court entered that order. That's the November 2nd, 2023 order, right? I do not know. I can't answer that at the date, but I don't recall ever signing any order or preparing any order that had to be prepared by the defense because I had nothing to do with that protective order. And I objected to it. I said, I'm not signing it because you were asking me to give up things, facts about the case that I don't even know about. And I intend to get them by discovery. That was entered on November 2nd, that was entered by the court November 2nd, not by me. I didn't prepare that order. Well, the protective order wouldn't bar you from viewing the discovery. The protective order would just make sure you couldn't share it with other people. Except they wouldn't tell me, excuse me, your honor, but they wouldn't tell me what- You set up a situation where you essentially chose not to view discovery because you wouldn't accept viewing it in the context of a protective order. What harm would there be in going forward with viewing the discovery in a protective order context? You can always go to the court and say, judge, these aren't trade secrets. These are things after the fact, but you set up a situation where you didn't get to see stuff because I just don't understand it. Well, I'll tell you what I understand it to be. I could never see what the protective order was in this case law that says, if you don't identify what is the subject of the But that isn't what happened. The protective order was entered. When I try to get my discovery, when you're going to discover, you don't know what you're going to get. I can't specify what are the protected trade secrets when I don't even know what they are. It won't tell me what they are. Now, how in the world can I prepare an order saying it's okay? I know I didn't prepare that order. If the record is, I just don't understand how anybody could say that I would prepare an order for a trade secret. I objected to the order and I told Mr. Northrup, I said, if you don't tell me what the trade secrets that you're trying to protect, how can I make a judgment about whether I should object or not? I don't know anything about anything. I hope that answers the question or whatever the objection is. Let me ask a question about causation, if I may. The testimony of Dr. Ligouris, if I'm saying that right, and Dr. Pritchett, if that testimony is uncontradicted, doesn't it stand for the proposition that there was no defect in the Zengel stent that caused any of Babsack's injuries? Absolutely not, your honor. What it says is, the stent arrested the glaucoma and Dr. Chakoo in one of her reports, the report that she submitted, she said, Mr. Babsack had no problems until they put this gel stent in his eye. After that, all these problems arose. Now, it doesn't take much logic to connect the dots to say he had no problems. Of course, when you have glaucoma, there's no pain, it's just a cloudiness and it's a lens problem with the eye. We have no objection. The glaucoma condition was arrested. I want to go back to my question, which was, just focusing on Dr. Ligouris' testimony and Dr. Potey, they said that there was no defect in the Zengel stent that caused any of Babsack's injuries. Is that not a fair summation of their testimony? Well, Dr. Ligouris last saw Mr. Bobchock. I just want to know, is that a fair summation of their testimony? Okay, short answer is no. Okay. And the reason is because Dr. Ligouris did not see Mr. Bobchock after April 26, I think, of 2019. It's not okay because Dr. Potey in 1923... You're impeaching their testimony and that's fine, but I just want to know, is it... I mean, setting aside all the criticisms, does their testimony stand for the proposition that nothing in the Zengel stent caused the injuries? Yeah, they can say whatever they want, but we... But this is a summary judgment motion, and we're looking at the testimony. If that's their testimony, doesn't that shift the burden of production to you to come up with an expert to say otherwise? It sure does, and I'll tell you what... And then who's your expert that says otherwise? Okay, Dr. Potey is on in 2023, if I'm not mistaken. He said, left eye tearing, vision affected, burning, dry, itchy, watery, and hazy. The conditioning is worsening. New conditions associated with X-Gen glaucoma treatment system after implant, but not present before implant. Then he says the patient has a blind spot, temporal OS, which is the left eye, not present before the Zengel glaucoma system implanted three years ago. Number three, patient complains of tearing, aqueous humor most of the time. The tearing problems have existed ever since the surgery three years ago. Dr. Potey direct comment out of his notes. Four, left eye glaucoma at severe stage. Five, blood temporal superior. They just noted that. So then when they asked Dr. Potey the deposition in, I think it was June 6th of 2024, he said, well, the glaucoma system is working just great. Now, his own notes contradict. If you want to talk about contradiction, he's saying that Mr. Bobchock's got all these problems and he says associated with the X-Gen glaucoma treatment system after implant, but not present before implant. Patient has blind spot, not present before X-Gen glaucoma system implanted three years ago. I think, and I think the medical evidence is always in Mr. Bobchock's favor because we're talking about a product's liability situation, not the medical aspect of it. The glaucoma treatment was successful, but the baggage that came with it in the ensuing years is what we're talking about in this case. And I think that they have never explained that. And they did not warn the patient that the medical sterilization of the glutaraldehyde, that's the most toxic substance that known to man. Your honors, I wrote the state of Illinois and I said, what do you know about glutaraldehyde and waste treatment? They sent a letter back to me and said, A, waste treatment, people can take anything that they ask for. And then B is glutaraldehyde, it must be neutralized before you put it in the waste water system because it's so dangerous. Now, when you're putting that into someone's eye and there's a burning sensation, the day after the implant surgery was made, and then they had the gall to say, Mr. Bobshock told Dr. Ligouris, there's something wrong with the stent. He's a lay person, he doesn't know that. What he did know was there's burning in his eye and it's persisted for seven years. And the New Jersey standards said, when you have contact with glutaraldehyde and it's not arrested or taken out some way, it can last for years. And that's happened here. And that's what this state lawsuit is about. Mr. Guyon, I've let you go over your time and you will have time in reply, okay? Yeah, thank you, your honor. It's a pleasure being here. Oh, thank you. Mr. Northrup, you may respond. Good morning, your honors. My name is William Northrup. I'm here on behalf of the appellate AFI. And there's one thing I agree with Mr. Guyon on from his argument, which is that this is a product's liability case. And as a product's liability case, the plaintiff has to have evidence to show that the product at issue was defective and that the product at issue caused his injuries. We're here on summary judgment. And in the MAP Construction v. Truco case, the first district described summary judgment as the put up or shut up moment in the case. The moment where you have put your evidence down. If we show evidence that rebuts an essential element, the plaintiff has to show evidence to create a fact issue on it. You put the cards down and you look at what it says. And in summary judgment here, the plaintiff put up nothing. Justice Brennan, your characterization of Dr. Potee's testimony is absolutely correct. Dr. Potee did explicitly say that not a single one of Mr. Babshak's complaints was caused by his stint. He went further and said that there was not a single one of his complaints was contributed to by his stint. And he's clarified that that testimony was being given to a reasonable degree of medical certainty. That testimony came about when Mr. Babshak, or not Mr. Babshak, excuse me, Mr. Gyan at the deposition created a council-driven list of 16 complaints that Mr. Babshak had about his eyes. We're down to three, but at the time there was a list of 16. And he went through that list with Dr. Potee. I said, we went through this list with counsel. Are any of these caused by the stint? No. Are any of these contributed to by the stint? No. And on the three complaints that we currently have, Dr. Potee gave further testimony. He gave testimony about alternative causes of these complaints. Mr. Babshak's complaints right now are eye burning. Dr. Potee explained that eye burning is one of the most common complaints that people have as they age. It's extraordinarily common. It can happen without any cause. He said most likely cause is dry eye, which is a condition where the tear layer dries up and it causes irritation. And he said, I think this is what's happening here. Mr. Babshak has dry eye. It doesn't have anything to do with his stint. It maybe has something to do with a bleb. We'll get to a bleb in a minute, but a bleb is a conduit that is created as part of this surgery. It's not part of the stint. It's a raised area in the eye. The way the stint works to control glaucoma is it creates a channel for aqueous humor to leave the eye and go and be absorbed into the trabecular meshwork, the ducting system of the eye. And the reason that's done is because glaucoma is associated very closely with high internal eye pressure. And the way you control it is you take mechanisms to reduce the internal eye pressure. And the stint is one of these mechanisms. But he said basically Mr. Babshak has a dry eye. It's a very common condition. It's not caused by the stint. This is the source of the irritation. The second complaint was eye watering. Dr. Potee says the very first thing he does when he has a patient who is complaining of eye watering is he schedules an irrigation of the tear ducts. And the reason he does that is as people age, it's very common for a tear duct to get blocked. And when a tear duct gets blocked, the eye continues to produce tears, but there's no mechanism to take them back up. And so they build up on the eye and they create watering. And he did that with Mr. Babshak. He scheduled a procedure to irrigate the tear ducts. And then Mr. Babshak called about a week later and said, I'm not really bothered by the eye watering right now. Let's cancel that. And it was canceled and never rescheduled. And Dr. Potee said, I think he's probably got a blocked tear duct. I would need to irrigate that if that's bothering him enough to do it. And then if I irrigated that and it wasn't a blockage, then I think it's related to dry eye. And that is kind of counterintuitive when you talk about dry eye and you talk about eye watering. Dr. Potee explained when you have dry eye, you have irritation. Irritation then causes tearing, which makes the eye water. So he said, these are what I think is going on with Mr. Babshak's eyes, but there is absolutely nothing about the stent that caused this. And the last complaint right now is loss of vision. And Dr. Potee was crystal clear on this and it's documented in his records. Every time Mr. Babshak comes in, they do a vision analysis. And he said that all of Mr. Babshak's loss of vision, 100% of it, was caused before the stent was put in and was caused by the glaucoma. Unfortunately, glaucoma is a condition that kills parts of the optic nerve, damages the optic nerve, and causes a loss of vision. And he says it's very, very common for people who have glaucoma to not notice it as it's going on. He described glaucoma as the silent thief of vision because people don't see it's going on. They only appreciate it afterwards. It's very common for someone who's lost vision to glaucoma to only really recognize the extent of the lost vision afterwards. But he said, I tested his eye every time he came in. His vision is not getting worse. His vision is the same as it was the day before the stent was put in. There is no loss of vision caused by the stent. So between Dr. Potee- Let me ask you this question. I appreciate the explanations from both counsel, but there is a statement that the glaucoma has been arrested. Is that correct? Dr. Potee- That is correct. The glaucoma has been arrested. Every test he's had since the stent was put in was in the range of 10 to 12. I don't know if it's the exact measurement. Dr. Cuthbert- So in layman's terms, in layman terms, the pressure has been contained. It's not increased. Dr. Potee- Exactly. The pressure has back to normal since the stent was put in. It hasn't increased. There hasn't been any failure of the stent. In fact, Dr. Potee said the stent is working wonderfully. Dr. Ligouras said when he looked at Dr. Potee's records, he said, I wish all my stents were as this affected this long. Dr. Cuthbert- Let's say that the pressure is contained. It's been, how does that relate to vision loss? Or should there be considered to be no increase in vision loss? Dr. Cuthbert- It would be, there would be no, you would not anticipate any further vision loss from, because the pressure has been contained. And then that's what's documented actually. And each of Dr. Potee's records where he does the vision test, you see that the field has not changed. And that's Dr. Potee explained that in his deposition. I want to just very briefly address the interrogatory issue. Plaintiff's counsel served a set of interrogatories that had roughly 135 subparts. The rule 213C is very clear that you have 30 interrogatories, including subparts. Mr. Babchick, Mr. Dian, apologies, has confused the limit on subparts with what the rule says in subpart J, where it says the Supreme Court by administrative order may approve standard form interrogatories for different types of cases. And then in the comments to the rule, it says if the Supreme Court approves a standard form interrogatory, and that standard form interrogatory has subparts, and you use that one, that only counts as one interrogatory. But the key thing is it's the Supreme Court that has to do it. And the Supreme Court has only done it in a couple of types of cases, matrimonial cases, motor vehicle cases, medical malpractice cases. They haven't approved standard form interrogatories for product liability cases. And Judge Holland, our circuit judge at the argument on this, told plaintiff's counsel, just because the Supreme Court can do it doesn't mean you can do it if it's not a case the Supreme Court has done. And in his brief, plaintiff's counsel quotes that language and says, why not? And the why is simply this is a power issued by the Supreme Court. The 30 interrogatory rule without subparts is how discovery has been done in every product's liability case in this, in Illinois, and it works fine. If he feels like he needs more, he has a procedure. He can ask leave. He can move for leave. He never did that. He served a set of 135. It was stricken by the judge. He was told to go back and serve a set of 30. He served a second set, which was 80. And we know that it was the same problem because it literally was the same set with 50 questions lined out. So it was the same set. I called Mr. Gein and I said, this is not 30. Mr. Gein moved to compel. We went back to Judge Holland. Judge looked at, you got to get down to 30. He gave him another chance. Mr. Gein at that point did serve a set of 30 interrogatories, which we responded to an answer. When we answered that set of 30 interrogatories, there was no meet and confer about, hey, I didn't get enough, no meet and confer about, you didn't tell me this, and I asked for it, no motion to compel, nothing. Until we got to summary judgment and we started making this argument about interrogatories, I thought we were done. I thought we had put that behind us. And of course, interrogatories are not the only means of discovery in Illinois. You have unlimited requests for production. Mr. Gein served six. We produced 300 pages of recall documents to him in response to those six interrogatories. Many of those documents were marked confidential pursuant to the protective order. There has not been a single point in this case where I have refused to produce something and the protective order doesn't stop production. The protective order allows production. I mark something as confidential. He's allowed to use it. He's allowed to show it to his expert. He's just not allowed to disclose it. I haven't refused to produce a single document based on trade secrets. I've marked documents that I've given him and marked confidential. He has 300 pages of the recall. They identify the people who were involved in the recall. They identify the corrective action that was planned to be taken for the recall. So, all of this was provided to Linus Council. So, I don't know what he's saying. He didn't get discovery. Let me ask a question about the 2019 recall letter. You know what it says. During inspection, four units of unreleased SIN 45 lot were observed to have trace amounts of polishing compounds that are used, etc. Here's my question. From that disclosure, is there any inference that can be made about the percentage of defective released products? That statement doesn't have the percentage, but it was less than one-tenth of one percent. There were 6,000 units in that lot. That's covered in the recall documents that we've produced. This was a precautionary recall. It was a very miniscule number that had this problem, which is why when the recall was done, we said, don't take them out of anyone's eyes. Just send back any unused lots. There's testimony from Dr. Ligouris on the recall, which is very meaningful because this recall was based on visible trace amounts of polishing chemicals. Dr. Ligouris said, I inspected this. I inspect every stint I put in. If I see anything wrong with it, it goes in the trash, I get another one. I've never seen this issue on any of the stints I've inspected, and I didn't see it on Mr. Babczak's. If I had, I wouldn't put it in his eye. Then, Mr. Guyon raised the issue of, well, what if it's too small? What if you wouldn't notice it? Dr. Ligouris said, if I put a stint that had polishing compound into someone's eye, I would see an immediate inflammatory reaction to that polishing compound. There was no inflammatory reaction. I saw him in the time period after the implant, and there was never an inflammatory reaction, never anything like that there. He did complain about eye watering, but there was no inflammatory reaction, nothing going on. It doesn't have anything to do with the stint at that time period. There was, the recall suggests there might be a problem with some units in some lots, but on this one, we have specific testimony from the doctor about this unit that went in this patient's eye. That's enough to defeat any inference, particularly given the small amount of units in this lot. What was the polishing compound? I have, hold on just a second. Let me pull it up for you because I wrote it down because it was, I apologize, I can give you a second. It was some salts. It was aluminum oxide, silicone, and a combination of silicone in various salts, including sodium salt, potassium salt, calcium salt, and chlorine salt. Well, the aluminum oxide would be the aspect of it, I think. Okay. Yes. Now, this polishing compound, is there anything of record that it's visible to the naked eye? I mean, it was seen, I mean, that's how the recall was discovered. It was observed by people looking at the lots, and they said, what's this going on? And they looked at it. So, it was something that was visible, which is what triggered the recall. And then again, the inflammatory reaction that did not happen here, Dr. Lagoras testified, is clearly something that would be visible. Well, visible is visible. How is it, how does it become visible? Well, you have, in terms of an inflammatory reaction, I mean, you have redness, you have... Oh, you can see the effect of these compound salts, yes, for irritation. That's exactly what Dr. Lagoras testified. And so, the test is really whether there's a reaction. Is that correct, to the patient? In his testimony here is, yes, I would have seen a reaction and it didn't happen, but that's how he would have seen it there. How was the recall created? I mean, in the sense of who noticed that to necessitate a potential re... It was noticed by employees at Allergen, and then they investigated it, they sent documents, they sent what's called a CAPA, which is a corrective and preventative action. Oh yeah, that's the process, but how was it noticed by employees of Allergen? I mean, they visually inspect the product. Okay, so visual back to naked eye? Yes, your honor. Not a test through a scoping machine or something like that? No, this was observed visually through the naked eye. Okay. I see that I'm out of time, your honor, so thank you very much. Oh, you can summarize if you'd like. I mean, I give... Yeah, just very quickly, the evidence here, we're here on summary judgment, the evidence at the doctor's is overwhelming and it's unrebutted. There was no expert who said anything about gutturaldehyde, or even the expert that was excluded because she didn't have opinions on defect or causation, she didn't mention gutturaldehyde or anything like that. And so there's just simply affirmances proper. Thank you, your honors. Questions from the court? Not for me. Okay, thank you. Mr. Guyon, you may reply. Thank you, your honor. I'll make it as short as I can, but there's an extensive list here that I disagree with counsel Northrup, but here's the thing. Dr. Potey testified in 2024 that the glaucoma system was working fine, and we've never contested it. And my understanding of glaucoma is that when you get it, if you arrest it at whatever level you intervene, there still is a gradual creep of it, but not significant enough to cause problems, hopefully, but sometimes it can. Was that evidence of what you just said made part of the record by any expert, anybody testifying that it continues on as you just indicated? Your honor, in my main brief, I'm sure I referred to that with the definition of glaucoma. And in the exhibits, it's shown that what I just said, I believe that to be true. Nevertheless, that's just an incidental point. But at the same time, we're not contesting the glaucoma, but here's the problem. What this case is about is the burning sensation, the tearing and the loss of vision. And the defense has written a brief that they totally ignored that. There's two problems. They're saying that I can ask interrogatories about things that I don't know about. And how can I formulate an interrogatory when I don't know about it? If you identify the trade secrets that you're talking about, then I can work with that. But then we also have to overcome the trial court's overruling of the Illinois Supreme Court instruction, where they said you can have interrogatories with subparts. I disagree totally with Mr. Counsel Northrop when he says that only applies to the four examples that are shown in the appendix of the rules of the Code of Civil Procedure. It applies to every case filed. The Code of Civil Procedure applies to every case of any kind. And the court, I'm sure, is aware that we're moving ever more into a technological society. And years ago, the only cases that were held in the court were the automobile cases or things of that nature. But when we're talking about medical things, you have to have a technical background. You have to understand science to even make a judgment about it. Did you ever file a motion with the court for leave to propound more questions than 30? I never filed a motion. I quoted the statute to him. And I said, you know, the statute allows this. And he said, nope. In LaSalle County, you get 30 interrogatories, period. He said that four times and very emphatically. And then he kind of upset me a check who said directly. When they installed that stamp, that's what's caused Mr. Bobshock's problems. How can you get more definitive than that and more conclusory than that when the doctor, a professor of ophthalmology at Loyola University Medical Center says that directly? Now, the other thing, I'm almost done. When you say that we're talking about these, I could have certain things with the protective order. They're shifting the burden of proof to me or the burden of initiative to formulate questions about what trade secrets are involved. When I know nothing about this, about the stent thing and what they're making and what they're selling, I think they have to, in general terms, say these are the protective parts that we say are off limits. And then I can, if I look at that and they think it's irrelevant to what we're doing here in the case, then I can formulate an interrogatory and then they can do whatever they want with it. Now, there was some comment about Dr. LaGorse inspecting the stent. That was the point of my referring to the two pens. They are five millimeters and seven millimeters. That's the width of the line that you draw on a paper. The stent is six micromillimeters. That's one thousandth of the width. And they drill a hole in there. And that's where the drainage canal, so the glaucoma is controlled. How would Dr. LaGorse see that? Did he ever say that he took a microscope? And how could he see inside the tube, the canal that's there? They made no comment or provision for ensuring the sterility of the glutaraldehyde that all of in the cold process that they used, that they drained or removed any of the crystals. Glutaraldehyde is a chemical substance that does not unite with other chemical substances to form polymers. What it does, it can do that when you, what they call cross-linking. However, cross-linking is not, it is present in the process. That's another thing we don't know about. But when glutaraldehyde connects with water, it just, you know, it causes an acidic reaction that is in Mr. Bobchock's eye. And you know, you can't, you cannot take the eye out and clean it up and put it back in. What's there is there, and they can't do much about it. All they can do is try to sewage the effects of it by some treatment. But as far as I know, there isn't any treatment for the burning sensation. And I'm just about done here. Actually, one day after they installed the stent on February 12th, 2019, Mr. Bobchock said, I have a burning sensation in my eye. And the doctor said, that's part of the healing process. He did not know about any of this until November 8th, I think it was, when he got that letter from Ophthalmic Mutual Insurance Company saying that there's going to be a big recall because of this contamination that was admitted by the, it's admitted by the defendant. And they're saying that on a summary judgment that they can win when they had made the admissions of all these defects with that stent. Now, that's just unbelievable. And I can't believe that anybody would also say the Supreme Court rule for interrogatories is 30, but you can have sub parts. And in LaSalle County, that rule doesn't apply. And I cannot understand how that anybody would reach that conclusion. The trial court should never reach that conclusion. We're trying our best to find out information about this case. And we were stonewalled at every turn. So I would say that I would ask the court very respectfully to reverse this. Let's go on with the discovery and let the defendant tell us about their product and why it didn't cause all these problems to Mr. Bobchock, my client. He's the one that's the victim of all this. Thank you, Mr. Dionne. Are there any further questions from the court? No, thank you. Thank you, your honors. Thank you, your honors. Thank you, counsel, both for your arguments on this matter this morning. It will be taken under advisement and a written disposition shall issue.